

**FILED**

Feb 26 2015, 9:57 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Jason D. May
Indianapolis, Indiana

Troy M. Miller
V. Samuel Laurin, III
Bryan H. Babb
Bose McKinney & Evans, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Beverly J. Mack
Huelat Mack & Kreppein, P.C.
Michigan City, Indiana

Edward B. Keidan
Conway & Mrowiec
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

Skyline Roofing & Sheet Metal
Company, Inc.,

*Appellant-Plaintiff,*

v.

Ziolkowski Construction, Inc.
and United Union Roofers,
Waterproofers and Allied
Workers Local #26,

*Appellees-Defendants.*

February 26, 2015

Court of Appeals Cause No.
71A03-1406-PL-217

Appeal from the St. Joseph Circuit
Court.

The Honorable Michael G. Gotsch,
Judge.

Cause No. 71C01-1009-PL-183

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Skyline Roofing & Sheet Metal Company, Inc. (Skyline), appeals the trial court's summary judgment in favor of Appellees-Defendants, Ziolkowski Construction, Inc. (Ziolkowski) and United Union Roofers Waterproofers and Allied Workers Local #26 (Local #26)[1] (collectively, Appellees), concluding that Skyline failed to establish a genuine issue of material fact that Appellees violated Indiana's Antitrust Act.

We reverse and remand for further proceedings.

## ISSUE

Skyline raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court properly concluded that Skyline failed to establish a genuine issue of material fact that Ziolkowski violated Indiana's Antitrust Act by unlawfully restraining open and free competition in bidding for a public project to build a new middle school.

## FACTS AND PROCEDURAL HISTORY

At some time prior to August 2009, the Kankakee Valley School Corporation (Kankakee Valley) planned to construct a new middle school in Wheatfield,

---

[1] Although Local #26 is listed on the caption of the briefs, this appeal only involves the summary judgment in favor of Ziolkowski.

Indiana. To that end, Kankakee Valley mapped out a campaign that included enlisting the unions to help pass a referendum that would eventually fund the new middle school project (the Project). The unions placed union members at voting sites to show their support for the referendum and the Project. The referendum passed. *See Skyline Roofing & Sheet Metal Co., Inc. v. Ziolkowski Const., Inc.*, 957 N.E.2d 176, 180 (Ind. Ct. App. 2011) (*Skyline I*).

[5] In August 2009, Kankakee Valley issued an advertisement requesting bids for the Project and setting September 17, 2009, as the deadline for submission of such bids. During a pre-bid meeting on September 8, 2009, which was attended by Ziolkowski, it was clarified that any submitted bid must include a list of the proposed sub-contractors. At the same time, Glenn Krueger (Krueger), the superintendent of Kankakee Valley, specified that he "did not want to see non-union contractors." (Appellant's App. p. 222).

[6] On September 17, 2009, Ziolkowski timely submitted its bid to Kankakee Valley. After bids were opened, Kankakee Valley notified Ziolkowski that it was the successful bidder for the Project. In turn, Ziolkowski notified Skyline, a non-union subcontractor, that it had "submitted the low bid" for the roofing system of the Project and that Ziolkowski had listed Skyline "on the subcontractor list" submitted to Kankakee Valley. (Appellant's App. p. 303). At Ziolkowski's request, Skyline sent it a detailed list of "customer references for projects currently in progress, projects that are constantly ongoing[,] and completed projects." (Appellant's App. p. 189). On September 23, 2009, the Project Architect, Steven Park (Architect Park), emailed Krueger with a

comparison of different roofing systems and identified Skyline as a non-union contractor.

[7] On September 30, 2009, Kankakee Valley notified Ziolkowski of its intent to enter into a contract with the company. That same day, Kankakee Valley received a public records request from Local #26 asking for copies of Ziolkowski's bid documents, including Ziolkowski's subcontractor list. Local #26 subsequently discovered that Ziolkowski was "using Skyline." (Appellant's App. p. 239).

[8] On October 5, 2009, Ziolkowski and Kankakee Valley entered into a contract for the construction of the Project. Meanwhile, Krueger received complaints from representatives of the Local #26 who expressed their concern that Skyline was a "nonunion roofer and that they would love to have the job." (Appellant's App. p. 312). On October 16, 2009, Ziolkowski emailed its subcontractor list for the Project to Krueger, and listed Skyline as the subcontractor for the roofing system. Three days later, at 7:39 a.m. on October 19, 2009, Krueger replied, "I have the Ziolkowski Contract on my desk. I am deeply concerned about a union job action due to the non-union roofer. I will be seeking advice from our lawyer and a review by the School Board before I sign." (Appellant's App. p. 331). One hour later, at 8:25 a.m., Krueger emailed Architect Park, stating, "I have Ziolkowski's Contract. There is a huge issue over the roofing sub who is not union. I am not sure what to do. I am sure the unions will stop

the project." (Appellant's App. p. 325). Architect Park replied, understanding "the concern but this is where a lot of the costs issues have come in from the bids. If we need to change the roofing contractor it would seem that we would need to rebid the project because it determined the selected contractor?" (Appellant's App. p. 325). Krueger then inquired whether it was possible to "re-bid" the Project, to which Architect Park responded: "Would need to stop everything and re-advertise. Even then we cannot eliminate non-union bidders." (Appellant's App. p. 329). Krueger agreed, and the following day he affirmed:

> I guess we are stuck. There is no question this non-union situation strains the relationship between the contractors hiring them and me. I am not a happy camper. We passed ou[r] referendum with the help of the unions and now we turn on them. This non-union issue is deadly for our next referendum. It is just a shame.

(Appellant's App. p. 329). Fifty minutes later, at 8:50 a.m., Krueger emailed Ziolkowski, with the subject line "Reject Sub:"

> I believe [Kankakee Valley] has the right to reject a sub-contractor. I am looking into the legal aspects of this and of course the issue is Skyline-non-union. The union helped us pass our referendum and as I stated in the Pre Bid meeting I did not want to see non-union contractors. That was ignored by [Ziolkowski]. I am not happy with this situation. In any event, I don't like to being ignored.
>
> I am discussing my legal options with our construction attorney.

(Appellant's App. p. 337).

[9] On September 21, 2009, Bill Favors (Favors), President of Ziolkowski, initiated a meeting with Krueger to discuss "the union/nonunion thing" as Krueger

"was a little disgruntled with the way the bid shook out" because Skyline was on the bid list. (Appellant's App. pp. 345, 347). The following day, after the meeting took place, Favors informed Krueger by email:

> I am sure you will be happy to know, we were able to negotiate terms with our <u>union</u> subcontractor this morning that will allow us to contract their services on your building. Although their financial terms were not completely satisfactory, we feel that to contract otherwise would jeopardize the smooth and successful construction of your building and increase your frustration. We will be sending you an updated subcontractor list in the very near future.

(Appellant's App. p. 350).

[10] Towards the "end of October or during November," Ziolkowski started to organize the work schedule and noticed that "the roofing would land right in the middle of winter." (Appellant's App. p. 138). In order to get the roofing done in winter weather, Ziolkowski suggested to Kankakee Valley that they change the specification of the roof from an EPDM-type roof to a "mechanically fastened TPO"-type roof. (Appellant's App. p. 139). Ziolkowski invited the three roofing contractors—Midland, Korellis, and Gluth—who had previously also submitted bids for the EPDM roof, to submit pricing for the TPO roof. Skyline was not invited to bid on these revised specifications. Because the TPO roof allowed the Project to remain on schedule during winter and awarded a longer warranty, Kankakee Valley agreed to change the roof specification through a formal change order to Ziolkowski's contract. On December 4, 2009, Ziolkowski executed a subcontract agreement with Midland for the roofing work.

[11] In September 2010, Skyline filed a complaint against Ziolkowski alleging that it colluded with Kankakee Valley to exclude Skyline as the roofing subcontractor in favor of Midland in violation of the Indiana Antitrust Act. Ziolkowski moved to dismiss Skyline's complaint for failure to state a claim under Indiana Trial Rule 12(B)(6) and failure to join Local #26, Midland, and Kankakee Valley as necessary parties under Indiana Trial Rule 12(B)(7). After a hearing, the trial court dismissed Skyline's complaint without prejudice for failure to state a claim.

[12] In February 2011, Skyline filed an amended complaint against Ziolkowski and Local #26, again contending that Ziolkowski and Local #26 violated Indiana's Antitrust Act. As before, Ziolkowski and Local #26 each filed a motion to dismiss the complaint, asserting that Skyline's complaint failed to state a claim under Indiana Trial Rule 12(B)(6), Skyline failed to join Midland and Kankakee Valley as necessary parties under Indiana Trial Rule 12(B)(7), and Skyline's allegations were preempted by federal labor laws. The trial court dismissed Skyline's complaint with prejudice without a hearing. Skyline appealed.

[13] In our Opinion, issued October 25, 2011, we reversed the trial court's order. *See Skyline I*, 957 N.E.2d at 176. Finding error in the trial court's decision on the preemption issue and the joinder, and concluding that Skyline's complaint sufficiently alleged a scheme instigated by Ziolkowski to exclude Skyline and to constitute a restraint on free competition, we remanded the cause to the trial court for further proceedings. *See id.* at 188.

On February 20, 2012, Skyline filed its second amended complaint, contending that (1) Ziolkowski violated the Indiana Antitrust Act; and (2) Local #26 violated Section 303 of the Labor Management Relations Act. On February 28, 2014, both Ziolkowski and Labor # 26 filed their respective motions for summary judgment. On April 7, 2014, Skyline filed its cross-motion for partial summary judgment, together with its opposition to Ziolkowski's and Labor #26's motions for summary judgment. At the request of Appellees, the trial court struck Skyline's cross-motion for summary judgment for being filed outside the court's case management deadline; however, the trial court ordered Skyline's cross-motion to be considered as a reply to Appellees' motions. On April 17, 2014, the trial court conducted a hearing on the motions for summary judgment. Approximately a month later, on May 29, 2014, the trial court, finding no genuine issues of material fact, entered summary judgment in favor of Appellees.

Skyline now appeals the summary judgment in favor of Ziolkowski. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to

resolve the parties' differing accounts of the truth . . . , or if the undisputed facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009).

[17] In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id*.

[18] We observe that, in the present case, the trial court did not enter findings of fact and conclusions of law in support of its Judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *Id*. However, such findings offer this court valuable insight into the trial court's rationale for its decision and facilitate appellate review. *Id*.

## II. *Analysis*

[19] Skyline contends that the trial court erred in entering summary judgment for Ziolkowski on its claim brought pursuant to Indiana's Antitrust Act (Act). The purpose of the Act is to prevent fraud and collusion in the letting of contracts and to protect trade and commerce against unlawful restraints and monopolies. *Gariup Const. Co., Inc. v. Carras-Szany-Kuhm & Assocs, P.C.*, 945 N.E.2d 227, 233 (Ind. Ct. App. 2011), *trans. denied*. Skyline filed its second amended complaint under two specific sections of the Act.

[20] Indiana Code section 24-1-2-3 provides, "A person who engages in any scheme, contract, or combination to restrain or restrict bidding for the letting of any contract for private or public work, or restricts free competition for the letting of any contract for private or public work, commits a Class A misdemeanor." Indiana Code section 24-1-2-7(a), in turn, provides a private right of action allowing treble damages, costs, and attorney's fees to "[a]ny person whose business or property is injured by a violation of this chapter." A plaintiff requesting damages under the Act must prove three essential elements: (1) a violation of the statute; (2) injury to a person's business or property proximately caused by the violation; and (3) actual damages. *Thompson v. Vigo Cnty. Bd. of Cnty. Comm'rs*, 876 N.E.2d 1150, 1155 (Ind. Ct. App. 2007), *trans. denied*.

[21] The premise of Skyline's claim is that the designated evidence establishes a genuine issue of material fact that Ziolkowski engaged in a scheme in violation of the Act to replace a non-union company—Skyline—with a union

contractor—Midland—as the roofing subcontractor for the Project. Focusing on Krueger's "extreme displeasure" that non-union contractors were performing part of the Project and his expressed "frustration" to be unable to reward the union for helping pass the referendum, Skyline maintains that Ziolkowski was pressured into selecting a costlier union roofing contractor. (Appellant's Br. p. 10). In response to these allegations, Ziolkowski rejects the existence of any scheme and contends that it is uncontroverted that Ziolkowski contracted with Midland after reviewing Skyline's references which indicated that Skyline lacked the ability to perform the roofing work on this complex Project.

[22] The designated evidence in the light most favorable to the non-moving party demonstrates that during a pre-bid meeting on September 8, 2009, Krueger stressed the importance of not using "non-union contractors." (Appellant's App. p. 222). Despite this caution, Ziolkowski submitted a successful bid for the Project, in which it had listed Skyline, a non-union company, as the roofing contractor "on the subcontractor list." (Appellant's App. p. 303). On September 23, 2009, before the execution of the contract between Ziolkowski and Kankakee Valley, Skyline gave Ziolkowski a detailed list of its customer references.

[23] Prior to Krueger signing the contract with Ziolkowski for the Project, Ziolkowski emailed him the subcontractor list on October 16, 2009, in which Skyline was still identified as the roofing subcontractor. Meanwhile, at the instigation of a public records request from Local #26, Krueger was informed

by the union representatives that Ziolkowski was using a non-union roofing company as its subcontractor on the Project and that Local #26 "would love to have the job." (Appellant's App. p. 312). Three days after Skyline was disclosed as the roofing contractor and after a meeting with Local #26 representatives, Krueger shared his "deep" concern with Ziolkowski "about a union job action due to the non-union roofer." (Appellant's App. p. 331). He advised Ziolkowski that prior to signing the contract, he would be "seeking advice" from counsel. (Appellant's App. p. 331). Within the hour, Krueger consulted with Architect Park, discussing this "huge issue" of a non-union roofing subcontractor and agreeing that the only solution is to re-bid the Project but even then non-union bidders could not be eliminated. (Appellant's App. p. 325). Not being "a happy camper," Krueger contacted Ziolkowski the following morning, October 20, 2009, by email with subject line "Reject Sub," and expressed his frustration in adamant language:

> I believe [Kankakee Valley] has the right to reject a sub-contractor. I am looking into the legal aspects of this and of course the issue is Skyline-non-union. The union helped us pass our referendum and as I stated in the Pre Bid meeting I did not want to see non-union contractors. That was ignored by [Ziolkowski]. I am not happy with this situation. In any event, I don't like to being ignored.
>
> I am discussing my legal options with our construction attorney.

(Appellant's App. p. 337).

[24] Barely one day after receipt of this email, Favors, President of Ziolkowski, personally arrived in Krueger's office, placating Krueger and discussing "the union/nonunion thing." (Appellant's App. p. 345). The next day, October 22,

2009, Favors "happily" informed Krueger that they "were able to negotiate terms with our union subcontractor this morning that will allow us to contract their services." (Appellant's App. p. 350). Admitting that even though the financial terms were not completely to Ziolkowski's satisfaction, Favors acknowledges that a different solution would "jeopardize" the Project. (Appellant's App. p. 350).

[25] Faced with designated evidence that indicates the existence of a genuine issue of material fact pointing towards a scheme to prevent the free letting of a contract for the construction of a public project, Ziolkowski relies on two main arguments. First, Ziolkowski contends that "[b]y the time [Krueger] sent the October 19 and 20, 2009 emails, it is undisputed that Ziolkowski had already decided not to consider Skyline's bid." (Ziolkowski Br. 17). Characterizing Skyline as a fast food roofing contractor who had mostly completed one-day projects at Steak-N-Shake, Wendy's, Chick-fil-A, and Burger King restaurants, Ziolkowski claims to be "extremely concerned" that Skyline had no experience with a 250,000 square foot project, worth approximately $2 million. (Appellee's Br. p. 19). We disagree that the designated evidence conclusively leads to the result proposed by Ziolkowski.

[26] At no point during the terse email exchanges with Krueger did Ziolkowski alleviate Krueger's concern and clarify to him that the company was no longer considering Skyline for the Project. To the contrary, barely three days before Krueger's first email, Ziolkowski still stood by Skyline as its roofing subcontractor. The situation escalated to the point where Ziolkowski's

president personally met with Krueger. If Ziolkowski had indeed already decided that Skyline was unqualified for the Project, there would be no reason to incur the wrath of a disgruntled and frustrated customer or even the necessity to discuss this "union/nonunion thing" in person. (Appellant's App. p. 345). Moreover, Ziolkowski mischaracterizes Skyline's qualifications. Its references list projects from 350,000 square feet re-roofs to 200,000 square feet new construction projects, with roofs installed on well over 6000 buildings. Skyline's most notable projects include Fort Ben's Commissary Building, the Fishers public library, Arlington Elementary School, IUPUI's SPEA building, and the Carmel City Center, a job exceeding the contract amount of the Project at bar.

[27] Secondly, Ziolkowski maintains that the change in roof systems was instigated solely due to concerns with the performance of the specified system in winter weather and did not amount to a violation of Indiana's Antitrust Act. However, considered within the totality of the evidence, the timing of contemplating a new roof system in the Project is, at a minimum, suspicious. Towards the "end of October or during November" and after the email exchange with Krueger resulted in a new union roofing subcontractor, Ziolkowski suggested to change the specified EPDM-type roof to a TPO-type roof, which would allow them to continue working through winter. (Appellant's App. p. 138). Ziolkowski contacted three different subcontractors—not Skyline—to submit proposed pricing for the new work. Kankakee Valley subsequently agreed to change the roof specification through a

formal change order. Only after the new roof specification was agreed upon, did Ziolkowski enter into a subcontract agreement with Midland, a union contractor. A reasonable inference can be derived that the change order served as a mere subterfuge to easier get rid of Skyline.

[28] Moreover, during the roofing work on the Project, it also became clear that Local #26 contributed some specific funds towards the employment of its members, thereby affirming that Ziolkowski received some financial incentive—however slight—towards its trouble of having to "negotiate terms which [the] union subcontractor," which were not "completely satisfactory." (Appellant's App. p. 350). Not only did the business representative of Local #26 "volunteer" to work on the project for eleven days as a journeyman roofer paid for by Local #26, Midland did not have to pay travel expenses for other Local #26 union members. (Appellant's App. p. 358).

[29] Viewing the designated evidence in favor of the nonmoving party, we conclude that the evidence amounts to more than "speculation" and "innuendo" and raises at a minimum a genuine issue of material fact that Ziolkowski colluded to substitute a non-union contractor with a union contractor. (Appellant's App. p. 16). Serving as a catalyst, Krueger's disgruntled emails about selecting a non-union roofing contractor and his two cautions of "discussing [his] legal actions," spurred Ziolkowski into action to save the Project and ensure a "smooth construction." (Appellant's App. pp. 337, 350). Ziolkowski turned to Midland, a union roofing contractor, to replace Skyline, despite having publicly submitted Skyline as its roofing subcontractor in its subcontractor list. With

financial incentives received from Local #26 and a change order for the roofing specifications, Ziolkowski entered into an agreement with Midland. In this light, we conclude that the trial court erred in granting summary judgment to Ziolkowski. We reverse the trial court's grant of summary judgment and remand this cause for further proceedings.

## CONCLUSION

[30] Based on the foregoing, we conclude that Skyline established a genuine issue of material fact that Ziolkowski violated Indiana's Antitrust Act by unlawfully restraining open and free competition in bidding for a public project to build a new middle school.

[31] Reversed and remanded for further proceedings.

[32] Vaidik, C. J. and Baker, J. concur