## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2017, 7:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patrick F. O'Leary
Elkhart, Indiana

ATTORNEYS FOR APPELLEES

Bradford R. Shively
Jonathan R. Slabaugh
Sanders Pianowski, LLP
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jack A. Sheets,

*Appellant-Plaintiff,*

v.

A Progressive Realty, Inc., d/b/a Myers Trust and David Myers,

*Appellees-Defendants.*

November 15, 2017

Court of Appeals Case No.
20A03-1701-PL-161

Appeal from the Elkhart Superior Court

The Honorable Evan S. Roberts, Judge

Trial Court Cause No.
20D01-1305-PL-139

**Robb, Judge.**

## Case Summary and Issue

[1] Jack Sheets appeals the trial court's entry of summary judgment in favor of David Myers and A Progressive Realty, Inc. ("Progressive"), in his action alleging tortious interference with an at-will employment contract. Sheets raises only one issue for our review which we restate as: whether the trial court erred in entering summary judgment in favor of Myers and Progressive. Concluding the trial court did not err, we affirm.

## Facts and Procedural History

[2] In 1976, Interra Credit Union ("Interra")[1] hired Sheets to serve as an assistant to the chief executive officer. Nine years later, Sheets was selected to replace his former boss and serve as the CEO and president of Interra. Sheets' tenure lasted until 2013, during which time he helped grow Interra from "six employees and a few thousand members" to "150 employees [and] over 45,000 members . . . ." Appellant's Brief at 5.

[3] In November 2007, Myers was asked to join Interra's board of directors. Myers was a longtime veteran of the real estate industry, having founded Progressive[2] in 1985. Myers maintains a majority ownership of Progressive and serves as its president. Myers' son, Andrew Myers, works for Progressive as an independent

---

[1] Interra Credit Union originally opened its doors as Elkhart County Farm Bureau Cooperative Association Credit Union in 1932. Then, for what we can only assume are reasons of brevity, it changed its name to Elkhart County Farm Bureau Credit Union before becoming Interra Credit Union in 2008.

[2] A Progressive Reality d/b/a Myers Trust deals in both commercial and residential real estate.

contractor. In becoming a member of Interra's board of directors, Myers became subject to Interra's bylaws, Interra's code of ethics, and Indiana Code section 28-7-1-31.3(a)(b).[3]

[4] In January 2008, both Sheets and Myers attended Interra's planning meeting in Indianapolis. After presentations about potential expansion locations, the board of directors identified a location in Elkhart as a likely candidate. The board of directors instructed Sheets to proceed with planning the expansion and Sheets delegated the responsibility to Sanford Miller, Interra's Vice President of Branch Administration and a member of the senior management team.[4] Myers told Miller that his son, Andrew, could assist Miller in compiling demographic data about the possible expansion locations. Miller followed up with Andrew and acquired the relevant information. Andrew told Miller that he would not charge Interra for the data if they chose Progressive as their real estate broker. Myers also discussed possible expansion locations with Miller and visited Miller at Interra to discuss real estate prospects.

---

[3] Indiana Code section 28-7-1-31.3 provides, in relevant part:

(a) As used in this section, "official" means an individual who is or who was a director, committee member, officer, or employee of a credit union.

(b) An official of a credit union shall discharge the duties of the official's position in good faith and with the degree of diligence, care, and skill that an ordinarily prudent person would exercise under similar circumstances in a like position . . . .

[4] Sheets' responsibility as CEO and president included supervising four vice-presidents composing Interra's senior management team.

On February 14, 2008, Miller, Myers, and Andrew visited a property on Verdant Drive in Elkhart.[5] Myers testified that he brought Miller to the Verdant Drive location on Andrew's request. As Miller prepared to present to the board of directors his proposal for the Verdant Drive location, Andrew emailed the site's listing agent, Robert Letherman, to determine Progressive's commission for delivering a buyer. In his email, Andrew stated that Myers was behind the inquiry:

> Rob,
> My clients are bringing the property on Verdant before the their [sic] board tomorrow night. Hopefully you can wait on us.
> Two things my father instructed me I have to get for our office file: (and I am sorry he is a stickler)
> 1. Property profile sheet from your office containing the price and if there are any additional terms
> 2. Letter indicating the buyer brokerage policy for this particular property
> Thanks so much and I am sorry my father told me I had to get those two items, and well for now he is the boss[.]

Appellant's Corrected Appendix, Volume 3 at 124. Letherman responded he did not have a profile sheet for the property but advised that the price was $525,000. Andrew reminded Letherman that he had previously quoted a price of $495,000, and Letherman agreed, saying "I got 3 people looking at this lot. You are getting the best price. Good thing you got in early." *Id.*, Vol. 4 at 182.

---

[5] Miller testified at a deposition that Andrew brought "a number of properties to consider" and that he did not remember how many he, Myers, and Andrew visited. Appellant's Corrected Appendix, Volume 4 at 165.

Letherman also informed Andrew that the buyer brokerage policy was ten percent.[6] Andrew later emailed Miller and informed him that he did not believe any attempts to negotiate the price with the seller would be worthwhile.

[6] On March 20, 2008, Miller presented his recommendation to Interra's board of directors. The board of directors voted in favor of Miller's proposal and offered $495,000 for the property on Verdant Drive. Myers abstained from the vote.[7] Interra's offer was made conditional upon obtaining the Indiana Department of Financial Institutions' approval to construct a service office on the property. Interra's application for such approval, signed on July 23, 2008, provided:

> I, [Jack A. Sheets], President of Interra Credit Union . . . do hereby attest to the best of my knowledge, that Mr. David Myers, Board member, owns [Progressive], and that his son, Mr. Andy Myers, is employed by [Progressive], and that Andy Myers represented Interra Credit Union in the purchase of the land for the new branch. Andy Myers and [Progressive] will receive a normal 10% commission from the seller from the purchase of this land. Mr. David Myers abstained from the vote approving the purchase of this land. I am not aware of any other credit union official, or member of a credit union officials [sic] family, who will profit directly in any way from the transaction that is contemplated by this application.

---

[6] Letherman provided, "Broker Policy-10% commission paid to broker at closing." Appellant's Corrected App., Vol. 4 at 180.

[7] Myers also maintains that he "disclosed that he had an interest in the Verdant Drive transaction to Interra's board of directors." Brief of Appellees at 13.

*Id.*, Vol. 5 at 29.  The Indiana Department of Financial Institutions subsequently approved Interra's application.

[7] On July 23, 2008, a week before closing, Andrew informed Miller about the commission percentage.  Andrew stated:

> Sanford,
> I was thinking last night and thought that the [Department of Financial Institutions] may need to know what the commission is.  Which is 10% as set by the seller which he set for his amount for vacant land.  If we need to I can get a letter to that affect [sic].  In addition, we want to make it very clear that we were not engaged in this transaction based on commissions we have responsibility to the credit union, we submitted 7 sites and did not push any over the other based on commission.

*Id.*, Vol. 3 at 118.

[8] On July 31, 2008, the day of closing, Miller presented Sheets with a copy of a settlement statement filed with the U.S. Department of Housing and Urban Development.  Sheets stated this was the first time he became aware that Progressive was to receive all the commission paid on the transaction.[8]  Sheets stated that he was "bewilder[ed]" and "distressed" by the disclosure and that Andrew did not disclose the commission in the Purchase Agreement.  *Id.*, Vol.

---

[8] By the time Sheets learned the entire commission would be paid to Progressive, "Interra had already paid a $49,500.00 deposit that would be forfeited if Interra refused to close on July 31st."  Appellant's Corrected App., Vol. 3 at 71.

3 at 71. Sheets also stated that Myers did not disclose the commission to the board of directors. *Id.*

[9] At closing, Progressive's commission of $49,500 was paid by the seller. Miller testified that he was not concerned by Progressive's involvement in the transaction because the commission was paid by the seller and because he had evaluated several real estate properties and negotiated the purchase price. Nevertheless, Sheets was concerned by a possible conflict of interest and instructed Miller to use a different real estate broker, Phil Hahn, for upcoming branch expansions in Nappanee and Shipshewana. A property in Nappanee was purchased in November 2008.

[10] In January 2011, Sheets began a four-month medical leave as the result of a cerebral hemorrhage. Sheets returned to work without restrictions in August and Interra's board of directors retained an outside management consulting firm to help Sheets transition back into his role. In September, the board of directors officially restored Sheets to his office of CEO and president.

[11] In April 2012, Myers and two other board members issued a report on Sheets' job performance. The report stated Sheets' job performance was "excellent" and "outstanding." *Id.*, Vol. 6 at 47. Soon thereafter, the board of directors, including Myers, voted to increase Sheets' annual salary by $25,000. In August 2012, the board of directors voted to give Sheets tickets to see his favorite baseball team, the Chicago White Sox, and to pay for his travel to the game.

[12] On August 17, 2012, Interra's Vice-President David Birky placed a call to Interra's confidential compliance hotline and reported that Sheets was cognitively impaired and thus mentally unfit to lead Interra. The board retained a local retired circuit court judge to investigate the claim but it could not be substantiated.

[13] Interra resumed its search for possible expansion locations in late 2012. Myers proposed four additional sites to Miller, stating that he wanted to make sure Miller knew that the properties may be available. A property known as "Open Range" was among those suggested by Myers and he recommended that Miller have a site plan prepared for the location. Myers admitted to having communicated with the owner of Open Range sometime between October and December 2012.[9] Sheets and the senior management team reviewed the additional properties and unanimously recommended a different property on Berkshire Drive to Interra's board of directors. The board of directors authorized Sheets to proceed in acquiring the Berkshire Drive property on November 15, 2012.

[14] At some point after the November meeting, Myers began discussing Sheets' mental competence with Birky. Birky prepared a written memorandum detailing his concerns with Sheets' mental competence and presented the memorandum to the board of directors.

---

[9] Sheets does *not* allege that Myers or Progressive had a financial interest in Open Range.

[15] In January 2013, the board of directors conducted an executive session to review Sheets' performance. Myers "questioned whether the goal was to work to retain President Sheets or whether the goal was to change leadership." *Id.*, Vol. 6 at 85. After polling the board members, they agreed to make a change— unanimously voting to transition Sheets out of his role as CEO and president. A board member suggested Myers be the board spokesperson during the meeting with Sheets because "he already seemed to have an explanation for the decision." *Id.*, Vol. 6 at 86.

[16] At a special board meeting on February 15, 2013, Myers informed Sheets of the board's decision. A few months later, on May 8, the Interra board of directors presented Sheets with a letter outlining the reasons for their decision. The board's letter included the following:

> a. That there were significant shortcomings in the development of good working relationships between the President and staff, management, and the Board with even an attitude of fear and worries about retaliation or retribution if people said or did anything which was contrary to your perspective or ideas;
>
> b. That you were resistant to change, stubborn, inflexible, and not open-minded, even with respect to Board direction;
>
> c. That you were excessively controlling and dominating of the agenda to the extent of hampering decision-making;
>
> d. That you demonstrated a lack of organization and preparation at times in response to Board requests for

information as well as in Board meetings and planning sessions only to focus on minor issues, stray to unrelated subjects, and waste Board and management time with items not on the agenda.

e.     That your representation of the Credit Union was not always what it should be with times you were late to meetings, missing at functions, might interject inappropriate jokes or comments, make uninvited appearances, etc.

*Id.*, Vol. 5 at 91-92.

[17]     Soon thereafter, Sheets commenced three separate lawsuits.[10]  In the present action, Sheets alleged that Myers, individually and as an agent of Progressive committed the tort of intentional interference with an at-will employment contract.  Myers denied the allegations and filed a counterclaim, claiming the action was frivolous and seeking attorneys' fees.  On March 6, 2015, Sheets filed a motion for partial summary judgment.  Myers responded and filed his own motion for summary judgment.

[18]     On September 8, 2015, the trial court granted Myers' motion for summary judgment finding he acted within the scope of his official duties as a member of the Interra board of directors.  Sheets promptly filed a notice of appeal, but, upon Myers' motion, this court dismissed Sheets' attempted interlocutory appeal because there was no final judgment as Myers' counterclaim remained

---

[10] *See Sheets v. Birky,* 54 N.E.3d 1064 (Ind. Ct. App. 2016).

unresolved. In December 2016, the parties filed a joint stipulation for dismissal of Myers' counterclaim without prejudice, thus bringing the litigation to an end in the trial court. Sheets now appeals.

# Discussion and Decision

## I. Standard of Review

When reviewing a trial court's ruling on summary judgment, we apply the same standard as the trial court. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Poznanski ex rel. Poznanski v. Horvath*, 788 N.E.2d 1255, 1258 (Ind. 2003). The party appealing the trial court's grant of summary judgment has the burden of persuading the court that the grant of summary judgment was erroneous. *Diversified Invs., LLC v. U.S. Bank, NA*, 838 N.E.2d 536, 539 (Ind. Ct. App. 2005), *trans. denied*.

Where, as here, the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Skyline Roofing & Sheet Metal Co., Inc. v. Ziolkowski Constr., Inc.,* 26 N.E.3d 1024, 1028-29 (Ind. Ct. App. 2015). This standard is

more onerous than its federal counterpart in that the movant must affirmatively negate an opponent's claim. *Hughley v. State,* 15 N.E.3d 1000, 1003 (Ind. 2014). We also "give careful scrutiny to assure that the losing party is not improperly prevented from having its day in court." *Siner v. Kindred Hosp. Ltd. P'rship*, 51 N.E.3d 1184, 1187 (Ind. 2016). Indeed, "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Hughley,* 15 N.E.3d at 1004.

## II. Tortious Interference with Employment

[21]     Indiana has historically recognized two basic forms of employment: (1) employment for a definite or ascertainable term; and (2) employment at-will. *Orr v. Westminster Vill. North, Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). In the absence of a definite or ascertainable term of employment, employment at-will is presumptively terminable at any time, with or without cause,[11] by either party. *Wior v. Anchor Indus., Inc.*, 669 N.E.2d 172, 175 (Ind. 1996). Despite a general lack of protections, an at-will employee "must be able to expect that his continued employment depends on the will of his employer and not upon the whim of a third party interferer." *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 285 (Ind. 1991).

---

[11] On rare occasions, narrow exceptions have been found. *Meyers v. Meyers*, 861 N.E.2d 704, 706 (Ind. 2007). These exceptions include discrimination and retaliatory discharge. *Whirlpool Corp. v. Vanderburgh Cty.-City of Evansville Human Relations Comm'n,* 875 N.E.2d 751, 757-58 (Ind. Ct. App. 2007).

[22] In order to prevail on a claim of tortious interference with an employment contract, a plaintiff must establish: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship. *Bradley v. Hall,* 720 N.E.2d 747, 750 (Ind. Ct. App. 1999). An at-will employee may bring a claim of tortious interference if, in addition to the standard elements of the tort, he or she can demonstrate "that the defendant interferer acted intentionally and without a legitimate business purpose." *Bochnowski,* 571 N.E.2d at 285.

[23] Directors or officers are only personally liable for tortious interference with the corporation's contracts where they act outside the scope of their official duties in causing the breach. *Trail v. Boys and Girls Clubs of Nw. Indiana*, 845 N.E.2d 130, 138 (Ind. 2006). Our supreme court explained the tort in *Trail:*

> That an officer or director of a corporation possesses limited immunity from most charges of tortious interference with the corporation's contracts stems from both their role as agents of the corporation and the nature of the tort. A party cannot "interfere" with its own contracts, so the tort itself can be committed only by a third party. In the case of a corporation, the legal entity acts through its directors and officers. Thus, when officers or directors act in their official capacity as agents of the corporation, they act not as individuals but as the corporation itself. In doing so, they are not acting as a third party, but rather as a party to the contract and cannot be personally liable for tortious interference with the contract.

> Conversely, when directors or officers act outside the scope of their official capacity, they no longer act as agents of the corporation and therefore act as a third party. Directors and officers who act outside the scope of their official duties therefore can be held personally liable for tortious interference with a contract.

*Id.* (internal citations omitted). Sheets alleges that the trial court erred by awarding summary judgment to Myers and maintains that there is a factual dispute as to whether Myers was acting outside the scope of his official duties when he: 1) engaged in a pattern of self-dealing which made Sheets' job performance more burdensome; and 2) when he retaliated against Sheets for preventing Myers' attempts at self-dealing, resulting in Sheets' discharge.

## A. Improper Motivation

[24] Sheets invites us to use this case to "clarify the rule regarding director liability for acting purely in pursuit of personal advantage[,]" Appellant's Br. at 19, and relies on the following language from our supreme court's decision in *Trail v. Boys and Girls Clubs of Northwest Indiana*:

> Trail has not alleged that the actions taken by the defendants were prompted by a *legally improper motivation*. In his complaint, Trail alleged that the defendant's improper motivation was his refusal to defer to them on matters of corporate control. At oral argument, Trail asserted that the defendants' improper motivation was their desire to increase their own control over the operation of the Boys and Girls Clubs. However, in the unreported case which Trail himself cites, the court held that "[a]n increase in corporate control is not personal advantage" of the sort that takes a director or officer's actions outside the scope [of] their authority for the purposes of a tortious interference

claim. Nothing in Trail's complaint suggests that the "personal advantage" sought by the defendants was anything other than larger influence over the direction of the enterprise.

845 N.E.2d at 140-41 (emphasis added). Specifically, Sheets relies on the phrase "legally improper motivation," and alleges that our supreme court was unwilling to foreclose the possibility of director liability where such legally improper motivation is shown. *See* Appellant's Br. at 19.

[25] We disagree. In *Trail,* the plaintiff climbed the ranks of his not-for-profit corporation for almost twenty years before serving as its executive director. Plaintiff alleged that several members of the executive committee became unhappy with him for personal reasons and contrived a biased report to cast him in a negative light and justify asking him to resign. Reviewing plaintiff's claim for tortious interference with an at-will employment contract, our supreme court explained that:

> basic corporation law affords the directors authority to engage in the activity at issue. Because [the plaintiff] has not alleged any fact that overcomes the presumed and implied powers of the directors, we cannot agree with [the plaintiff's] assertion that the defendants acted outside the scope of their official duties in evaluating his work.

845 N.E.2d at 139. In affirming the dismissal of the plaintiff's claim, the court held that "no action can lie against the individual members of that group for exercising their rightful authority." *Id.* at 141.

[26] Our supreme court made clear in *Trail* that improper motive is irrelevant for the purposes of a claim of tortious interference with an at-will employment contract as long as a director or officer was acting within the scope of their official duties. Applied here, any alleged improper motivation by Myers is irrelevant if his actions were within the scope of his official duties as a member of Interra's board of directors. Therefore, we turn to the question of whether Myers' actions were within the scope of his official duties.

## B. Scope of Official Duties

[27] The scope of a director or officer's official duties is dependent upon the scope of their express or implied authority. *See Trail,* 845 N.E.2d at 139. Express authority can be conferred by statute, the articles of incorporation, bylaws, or a resolution from the board of directors. *Blairex Labs., Inc. v. Clobes*, 599 N.E.2d 233, 235-36 (Ind. Ct. App. 1992), *trans. denied*. Implied authority includes that "incidental authority necessary, usual, and proper to effectuate the main authority expressly conferred." *Indiana Dep't of Pub. Welfare v. Chair Lance Serv., Inc.,* 523 N.E.2d 1373, 1377 (Ind. 1988).

[28] Sheets contends that, "[a]part from the fact that Myers held the title of director during this time period, Myers designated nothing else in way of facts or evidence" from which a jury could conclude that his acts were within his official capacity as a director of the credit union. Appellant's Br. at 18. We disagree. First, Myers designated Interra's bylaws to outline a member of the board of directors' express authority. The bylaws provide:

*Section 3. Powers and Duties of the Board.* The Board of Directors shall have the general management of the affairs, funds, and records of the Credit Union together with such other powers and duties as are prescribed in [the Indiana Credit Union Act]. The supervision of the Board over the business of the Credit Union shall be such as will enable them at all times to know its general financial condition and to provide reasonable assurance that imprudent or dishonest conduct of any of its officers or officials will be checked or prevented. The Directors are agents of the Credit Union and may be held personally liable for losses and waste of money and property occurring through the violation of their duties and/or the law.

Appellant's Corrected App., Vol. 5 at 6. Myers also designated the Indiana Credit Union Act, Indiana Code section 28-7-1 et seq. Relevant here, Indiana Code section 28-7-1-16 provides:

(b) The board may appoint officers of the credit union.

* * *

(d) The board of directors shall have the general management of the affairs, funds, and records of the credit union and shall meet at least monthly . . .

* * *

(i) The board of directors by a majority vote may suspend or remove any officer from the officer's duties as an officer.

* * *

[29]     These designations were sufficient for the court to determine as a matter of law that Myers' actions were within the scope of his official duties. The board of directors is granted the general management of the affairs, funds, and records of the credit union by Indiana statute and Interra's bylaws. This broad grant of power is wide enough to encompass Myers' participation in Interra's expansion.[12] Further, Indiana Code section 28-7-1-16(i) grants directors the express power to "remove any officer from the officer's duties as an officer." Myers' actions surrounding Sheets' discharge were squarely within the express authority provided by statute. And, as our supreme court explained in *Trail*, Myers' powers were not limited to those express powers:

> Basic corporate agency law indicates that directors enjoy a wide range of authorized powers including both those powers expressly granted by statute and the articles of incorporation or by-laws, and that "incidental authority necessary, usual, and proper to effectuate the main authority expressly conferred." Certainly, such incidental authority includes the authority to investigate and evaluate the executive employees of the enterprise. To say that the directors lacked the authority to carry out the inquiry flies against standard corporation law.

---

[12] On the issue of Myers' alleged interference with Interra's branch expansion, Sheets seemingly admits that the board of directors had express authority but argues that the authority rested with the whole board of directors, not Myers individually. We find Sheets' perfunctory argument on this point unconvincing and conclude that Sheets has not alleged any fact that overcomes the express or implied powers of Interra's board of directors. *See Trail,* 845 N.E.2d at 139.

845 N.E.2d at 139 (citation omitted). Similarly, here, Myers had the requisite incidental authority to investigate and evaluate Sheets' performance as the CEO and president of Interra. To the extent that any of Myers' actions fell beyond his express authority, we find Myers' incidental authority broad enough to encompass such actions.

Sheets also raises the argument that, "As a general proposition, Myers certainly must have acted within his official capacity as director on some occasions and within his capacity as an agent of [Progressive] on others. However, it cannot be said that on *every* occasion, Myers must have been acting within both, simultaneously." Appellant's Br. at 17. Notwithstanding Sheets' intermixing of terms, we assume he refers to the relevant doctrine: the scope of Myers' official duties. As Sheets himself admits, Myers could have been acting within the scope of his official duties as the president of Progressive and a member of Interra's board of directors at the same time and his official duties were therefore not mutually exclusive. Having already found that all of Myers' relevant activities fell within the scope of his official duties through his express or implied authority, we need not specifically address this issue.

## C. Conflict of Interest

Finally, Sheets argues that he designated sufficient evidence of Myers' self-dealing that violated Interra's bylaws, his director's oath, and his statutory duty to act in good faith to raise a question of fact as to whether Myers' actions were outside his official duties. Again, Sheets provides no authority and assumes, without explanation or precedent, that simply because an action violated a

statute or Interra's bylaws that the action was thus outside the scope of Myers' official duties. Once more we reiterate that Myers' actions fell within the scope of his official duties.

Therefore, having determined that motive is irrelevant for the purposes of tortious interference with an at-will employment contract, Sheets' claims regarding Myers' motives are not material questions of fact. *See Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) ("A fact is 'material' if its resolution would affect the outcome of the case . . . .") Accordingly, Sheets has failed to meet his burden to convince us that the trial court's grant of summary judgment was erroneous.

# Conclusion

The trial court did not err in entering judgment in favor of Myers as to Sheets' claims for intentional interference with an at-will employment contract. Accordingly, we affirm the trial court's grant of summary judgment.

Affirmed.

Riley, J., and Pyle, J., concur.